**Edith JONES, et al., Plaintiffs,**

v.

**KAYSER–ROTH HOSIERY, INC., Defendant.**

**No. Civ. 3–89–545.**

United States District Court, E.D. Tennessee, N.D.

July 18, 1990.

Thomas M. Hale, E.H. Rayson, Kramer, Rayson, McVeigh, Leake & Rodgers, Knoxville, Tenn., J. Polk Cooley, Cooley, Simmons & Cooley, Rockwood, Tenn., Richard K. Evans, Kingston, Tenn., for plaintiffs.

Martin N. Erwin, Smith, Helms, Mulliss & Moore, Greensboro, N.C., D. Michael Swiney, Paine, Swiney, and Tarwater, Knoxville, Tenn., for defendant.

## MEMORANDUM OPINION

ROBERT P. MURRIAN, United States Magistrate.

This case is before the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73(b), Federal Rules of Civil Procedure, for all further proceedings, including entry of judgment [Doc. 4].

This is a class action brought pursuant to the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101, *et seq.* The class is comprised of all former employees at the Harriman facility of Kayser–Roth Hosiery, Inc. ("KR"), who are "affected employees" within the meaning of 29 U.S.C. § 2101(a)(5), and who sustained an "employment loss" within the meaning of 29 U.S.C. § 2101(a)(6), including but not limited to all employees terminated, laid off or separated from employment by the defendant on or about May 18, 1989, June 26, 1989, and/or September 8, 1989, except for discharge for cause, voluntary departure, or retirement, with respect to the following cause of action: Any claims under the Act, 29 U.S.C. § 2101, *et seq.*, resulting from the defendant's ordering of a plant closing or mass layoff without providing its employees with timely notice of the alleged plant closing and/or mass layoff as required by the Act.

The plaintiff class contends that on June 26, 1989, KR gave notice to its employees that the manufacturing facility in Harriman, Tennessee, would be closing on September 8, 1989; that the shutdown of the Harriman facility constituted a "plant closing" within the meaning of 29 U.S.C. § 2101(a)(2), or a series of "mass layoffs"

within the meaning of 29 U.S.C. § 2101(a)(3); that a large number of employees were notified on June 26, 1989, that their employment was being terminated effective immediately (*i.e.*, June 26, 1989); that said employees were given no prior notice of their termination as part of the plant closing; and that other members of the plaintiff class were given notice of their terminations at various times after June 26, 1989, but before the expiration of 60 days from the time of the notice [*see* Doc. 25]. Plaintiffs further contend that the defense of "business circumstances that were not reasonably foreseeable as of the time that notice would have been required" (hereinafter referred to as "business circumstances" defense), 29 U.S.C. § 2102(b)(2)(A) does not justify KR's failure to give less than 60 days notice; that the defendant's decision to close the Harriman plant was a result of manufacturing capacity greater than the demand for product and the poor quality of the product produced at said plant coupled with the defendant's inability to correct the quality problems; that these circumstances were reasonably foreseeable; and that even if KR is entitled to the business circumstances defense, defendant did not give as much notice as was practicable [*see* Doc. 25].

The defendant admits that the action taken on June 26, 1989, constituted a mass layoff or plant closing as defined in WARN and that no notice of the plant closing or mass layoff was given prior to June 26, 1989 [*see* Doc. 28]. Rather, the defendant contends that it was the irrevocable loss of business from J.C. Penney ("JCP"), the Harriman plant's major customer, which caused the need to close the Harriman plant; that although the plant was not to close until September 8, 1989, approximately one-third of the Harriman employees could not be retained to phase out the plant's operations; that these employees were terminated immediately on June 26, 1989; that the loss of JCP's business was not reasonably foreseeable on April 26, 1989; that defendant was, therefore, not required to give 60 days advance notice to employees terminated on June 26; and that

defendant gave notice as soon as practicable after the loss of JCP business became reasonably foreseeable [*see* Doc. 26].

It was determined at the pretrial conference in this case that the issue of liability should be bifurcated from the issue of damages [*see* Doc. 28]. In accordance with the Pretrial Order, the first phase of trial commenced before the undersigned without a jury on April 23 and 24, 1990, with regard to the following issues:

1. Did the defendant violate 29 U.S.C. § 2101(a)(1) as to one or more of the plaintiffs?

2. If so, is the defendant's conduct excused pursuant to 29 U.S.C. § 2102(b)(2)(A) and (3)?

3. Whether or not defendant would be entitled to a credit for any severance pay which may have been paid to class members (not to include a determination of the actual amounts involved during the first phase); and

4. What types of benefits might be recoverable pursuant to 29 U.S.C. § 2104(a)(1)(B), *e.g.*, life insurance benefits where no death occurred, health insurance benefits where no medical expenses were incurred (not to include a determination of actual amounts during the first phase).

[Doc. 28, Parts IV(a), (b) and X(d)(1), (2) and (3) ]. Final arguments were postponed until after preparation of the trial transcript and post-trial briefs; thus, final arguments were heard on June 29, 1990; *see* Doc. 38. After considering the evidence presented, the arguments of counsel, and their memoranda of law, the following findings and conclusions are made.

## I. FACTS

The defendant, KR, is a manufacturer of women's hosiery and socks with five operating divisions. The Sheer Hosiery Division manufactures ladies hosiery, primarily pantyhose, and is the division involved in this case. KR was a major supplier of ladies hosiery to JCP between the early 1950s until JCP withdrew its business from KR in 1989 [Defendant's Exh. 45]. The JCP business represented 40% of the Harri-

man plant's production volume and brought in approximately $20 million dollars in business. Testimony of Robert Fooshee at T.T.[1] 2–5; 2–7; Plaintiff Exh. 1, Cerchio Deposition at 8. The JCP account was very profitable for KR and was considered a "jewel" in KR's portfolio of businesses. Testimony of Fooshee, *id.* The remaining 60% of Harriman's production was only marginally profitable, if at all, and did not contribute substantially to any profit made by KR. *Id.,* T.T. 2–5 to 2–6. For example, in 1989, the Harriman plant budgeted $7.6 million of fixed overhead, which constitutes expenses that do not vary according to the volume flowing through a plant. *Id.* at 2–5. Fixed overhead includes costs such as annual insurance premiums, annual tax bills, etc. *Id.,* at 2–6–7. Thus, the only way to vary fixed overhead is to get rid of it completely. *Id.* at 2–7. The JCP business absorbed $3 million of the Harriman plant's fixed overhead. *Id.* at 2–5. KR manufactured eight styles[2] for JCP and these eight styles represented 94 percent of JCP's $20 million business. *Id.* at 2–7; Plaintiff Exh. 2, Cerchio Dep., Exh. 1.

Mr. Dominick Cerchio, KR's Vice President of Sales for the private label hosiery division, was the sales contact with JCP and was directly responsible for the JCP account. In October, 1988, KR began experiencing shipping problems due to a shortage of lycra in the industry. Defendant's Exh. 5; Testimony of Cerchio, T.T. at 27. Dorothy Rainey, JCP's buyer for women's hosiery, testified at her deposition taken in February, 1990, that deliveries were terrible in that partial shipments were outnumbering complete shipments at a ratio of 75% partial to 25% complete. Plaintiff Exh. 2, dep. of Rainey at p. 12. Significant complaints with regard to quality began in December, 1988. Plaintiff's Exh. 1, Cerchio Dep. at p. 15; plaintiff's Exh. 2, Rainey dep. at pp. 13–19. Thus, in January, 1989, JCP reinstituted a practice of routine and periodic audits or inspections of the product manufactured at the Harriman plant. Plaintiff's Exh. 2, Rainey dep. at pp. 26–27; Plaintiff's Exh. 1, Cerchio dep. at pp. 15; 17–18. On January 18 and 19, 1989, JCP audited four styles of hosiery (*i.e.,* KR#s 609, 904, 925, and 735). Plaintiff's Exh. 2, Rainey dep., exhibits attached thereto. Each style "barely" passed inspection, in that each style contained the maximum number of defects allowed. *Id.;* Testimony of Cerchio at T.T. 65–66; Testimony of Walter Pilcher at T.T. 2–97–98. As a result, JCP became very concerned about the quality problems with the hosiery manufactured at the Harriman plant and Dorothy Rainey scheduled a second audit in 60 days. Testimony of Cerchio at T.T. 66. Six styles were audited on March 14 and 16, 1989 (KR#s 904, 735, 609, 645, 790, and 637). Plaintiff's Exh. 2, Rainey Dep., exhibits attached thereto. Two styles, #s 735 and 609, failed the inspection and the other four passed. *Id.;* Defendant's Exh. 30. The poor results of the March audit precipitated a meeting between the defendant and JCP management on March 20, 1989, in Dallas, Texas. Testimony of Cerchio, T.T. at 67. In attendance at said meeting were Mr. Dominick Cerchio, Charles Poteat, Vice President of Manufacturing at the Harriman and Dayton plants

---

**1.** T.T. will be used throughout to abbreviate "trial transcript."

**2.** The eight JCP styles manufactured by KR were the following:

| | JCP Style # | KR Style # | Name |
|---|---|---|---|
| 1. | 6099 | 904R | Sheerest Support |
| 2. | 6498 | ~ 904Q | "            "        Queen |
| 3. | 6090 | 735R | Sheer Caress |
| 4. | 6490 | 735Q | "      "          Queen |
| 5. | 6093 | 609R | Sheer Caress (control top) |
| 6. | 6493 | 609Q | "      "        "          Queen |
| 7. | 5199 | 925R | Sheerest Support RT |
| 8. | 5598 | 925Q | "          "        "    Queen |

[Plaintiff Exh. 1, Cerchio Deposition, Exh. 1].

at all times pertinent; Bill Brookshire, KR's Vice President of Planning; Ladd Perry, KR's quality control person; Bill Truncali, Senior Vice President of Sales; Dot Rainey, and Arthur ("Art") Kapplow, JCP's merchandise manager for women's accessories and jewelry. Defendant's Exh. 7. At the close of the March 20 meeting KR was informed that it was losing style # 609 to Ithaca, Industries, a competitor of KR, which style represented approximately $4 million dollars worth of JCP's $20 million dollar business with KR. Testimony of Cerchio, T.T. at 68; defendant's Exh. 7. In an inter office memorandum from Bill Truncali to Walt Pilcher, President of KR, dated March 22, 1989, Mr. Truncali reviewed for Mr. Pilcher the results of the March audits and the discussions had at the March 20 meeting in Dallas. *Id.* Mr. Truncali states, *inter alia,* that

> Dot Rainey has been instructed by her management to source other hosiery mills as insurance in case we are not able to satisfy their quality and shipping demands in the next 2–3 months. We are in a critical situation with J.C. Penney and we are dealing with a new management team which only knows Kayser–Roth's performance for the last 12 months, not fifteen years. ... We have a major selling job to do on the J.C. Penney management team and we must put this account on top priority immediately.

Defendant's Exh. 7, at p. 2. A "task force" was formed by March 28, 1989, and scheduled to begin work at the Harriman plant on April 3, 1989. Defendant's Exh. 12; Testimony of Pilcher, T.T. at 2–111–112. The long and short term objectives of the task force were to work with the Harriman managers, identify and resolve current quality problems, late shipments and employee issues, and to develop an action plan to assure a profitable and productive operation at Harriman. Defendant's Exh. 7; testimony of Pilcher, T.T. at 2–112. After the March audit, JCP began inspecting more frequently, either weekly or every

ten days. Twelve audits were conducted between April 5 and April 26, 1989. Defendant's Exh. 61, plaintiff's Exh. 2, Rainey Dep., exhibits thereto. KR failed seven of the twelve audits on style nos. 735, 904, 925, 609, and two styles of "Jacqueline Ferrar", a new line of hosiery that was scheduled to be introduced on May 1, 1989. Plaintiff's Exh. 2, exhibits to Rainey dep.; Testimony of Cerchio, T.T. at 72. On April 27, Mr. Jerry Poole, KR's President of Department Store and Specialty Division, met with Ms. Rainey in Dallas, Texas. This meeting was prompted, in large part, by the results of the April audits. Testimony of Poole, T.T. at 92. The meeting was cut short by a phone call reporting three additional failed audits. *Id.,* T.T. at 93. Ms. Rainey informed Mr. Poole at the April 27 meeting that KR would lose the Jacqueline Ferrar line of hosiery as soon as JCP could find another supplier. *Id.,* T.T. at 128. Prior to the conclusion of the April 27 meeting, Mr. Poole invited Ms. Rainey to visit the Harriman plant and on May 1, 2, and 3, 1989, Ms. Rainey and her inspector, Bill Pardue, traveled to Tennessee and North Carolina to visit KR's hosiery plants. Ms. Rainey and Mr. Poole met on May 1 and Ms. Rainey toured the Harriman facility. Testimony of Poole, T.T. at 96–97. Although it is unclear on which date Ms. Rainey gave KR 60 to 90 days to correct the problems occurring at the Harriman plant, and although it is unclear whether she allowed 60, 90, or 60 to 90 days, it is clear that on either May 1, 2, or 3, 1989, Dorothy Rainey gave KR, at a minimum, 60 days to rectify the quality problems at the Harriman plant. Testimony of Malloch, T.T. at 2–81–83; plaintiff's Exh. 5, Malloch Deposition at pp. 28–29; Testimony of Pilcher, T.T. at 2–120. Seventeen audits were conducted in May, 1989. Exhibits to Rainey deposition; plaintiff's Exh. 1. Although the hosiery inspected in May had been 100% reinspected by KR personnel,[3] three audits still failed JCP inspection and six of the other 14 inspections passed only marginally. *See* exhibits to Rainey deposition, *id.* According to Ms. Rainey,

---

**3.** Once merchandise failed a JCP audit, KR was required to reinspect every piece; *i.e.,* 100%, as

opposed to random sampling or statistical inspection.

although KR was passing more audits in May, they were passing only marginally and the shipments of quality product were very small because KR was throwing away 62% of its reinspected product in order to pass the audits. Plaintiff's Exh. 2, Rainey dep. at pp. 47–48. At a meeting on May 9, 1989, KR was told that style no. 735 was temporarily being given to Ithaca Industries for a minimum of 90 days. Plaintiff's Exh. 2, Rainey dep. at pp. 53–54. *See also* testimony of Poole, T.T. at 98–99; defendant's Exh. 24. Style no. 735 accounted for approximately $4 million of KR's business with JCP.

On May 18, 1989, 500 people were laid off in an effort to reduce work in process and to reduce an excessive number of employees in relation to the amount of product produced at the plant. Testimony of Prochaska, T.T. at 143–146. Of the 500 people laid off on May 18, 230 were given a return date within two weeks and were, therefore, on definite temporary layoff. *Id.*, T.T. at pp. 144–145. The remaining 270 were laid off for an indefinite period of time; however, 111 of the 270 were recalled before June 26, 1989. *Id.* at 145–146.

On May 25, 1989, Jerry Poole, Dominick Cerchio, Dorothy Rainey, and Art Kapplow, met in Dallas. Testimony of Poole, T.T. at 100. Mr. Kapplow at that time informed Messrs. Poole and Cerchio that KR was losing style no. 904. Style no. 904 was the major line of hosiery KR produced for JCP and represented approximately $11 million worth of business to KR. Testimony of Poole, T.T. at 129; Testimony of Cerchio, T.T. at 83. KR, at this point, had lost $19 million of its $20 million business with JCP and was left with only style no. 925, which represented $1–$2 million worth of business. Testimony of Cerchio, T.T. at 83–84. *See also* defendant's Exh. 43. The loss of JCP's business was confirmed on May 26. Defendant's Exh. 43; Testimony of Cerchio, T.T. at 83. Mr. Poole subsequently contacted Mr. Kapplow to schedule a meeting among the senior management of KR and JCP. Testimony of Poole, T.T. at 105. Mr. Kapplow explained to Mr. Poole that the decision had been made and that JCP

senior management, *i.e.*, Ken Russo, Mr. Kapplow's superior, and Jack McConville, President of JCP, were aware of the decision. *Id.*, T.T. at 105–106. A meeting was, however, scheduled for June 21, 1989. *Id.*, T.T. at 107. On June 8, 1989, Ms. Rainey supplied KR with a schedule for phase-out by style, defendant's Exhs. 39, 43, and 44 at p. 4; Testimony of Poole, T.T. at 109; and on June 13 Ms. Rainey advised Mr. Cerchio that JCP's new suppliers were in place and that they would pick up their demand as scheduled in her June 8 memorandum. Defendant's Exh. 44 at p. 4.

On June 21, 1989, KR management met with JCP management in Dallas. Present for KR at this meeting were Mr. Walter Pilcher, Mr. Gary Malloch, President of KR's sheer hosiery division, Mr. Jim Birle, co-chairman and CEO of the Wickes Corporation (the holding company that owns KR), and Mr. Poole. Testimony of Poole, T.T. at 112–113. Present for JCP were Mr. McConville, Mr. Russo, Mr. Kapplow, Ms. Rainey, Mr. Pardue, and eight to ten other individuals. *Id.*, T.T. at 113. KR was given the opportunity to make its presentation; however, KR was informed at the conclusion of its presentation that JCP had already arranged to have other manufacturers manufacture its product; that the decision had been made; and that the decision could not be reversed. *Id.*, T.T. at 113–114.

Mr. Robert Fooshee, KR's Vice President of Finance and Chief Financial Officer, testified that once KR's most profitable business was lost, which business represented 40% of the business at the Harriman plant, leaving 60% of only marginally profitable, if at all profitable, business to pick up $3 million in fixed overhead which the JCP product was able to absorb, rendered it a " 'no brainer' " that the Harriman plant could no longer be economically operated. Testimony of Fooshee, T.T. at 2–6. Mr. Pilcher testified that without the JCP business, too much of the volume manufactured at Harriman was gone; and that to continue operating the Harriman plant without any hope of regaining the JCP business and without some new replace-

ment business within a short period of time, "just meant that we would be spending—spending money to keep the plant open in a way that was unacceptable, financially unacceptable." Pilcher testimony, T.T. at 2–137. Thus, as a result of the loss of the JCP business the decision was made to close the Harriman plant and notices were sent to all employees on June 26, 1989, informing them that the plant would close permanently as of September 8, 1989. Defendant's Exh. 55. The notice further provided that only a reduced work force would remain in force until the plant closed. *Id.* On June 26, 1989, KR had an active payroll at the Harriman plant of 803 employees and 496 employees were laid off on June 26, including the 156 employees who had been on temporary layoff status since May 18, 1989. Plaintiff's Exhs. 18 and 19.

## II. LIABILITY

29 U.S.C. § 2102(a) provides, *inter alia,* that

[a]n employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—

(1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and....

29 U.S.C. § 2102(b)(2)(A), however, provides that

[a]n employer may order a plant closing or mass layoff before the conclusion of the 60–day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

....

(3) An employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period.

The purpose of the WARN Act is to afford

... protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.

*United Electrical, Radio and Machine Workers of America (UE) and UE Local 291 v. Maxim, Inc.,* 1990 U.S.Dist.Lexis 5988 (D.Mass. May 15, 1990), 1990 WL 66578 (D.Mass.1990), 5 Indiv.Empl.Rts.Cas. (BNA) 629 (1990).

There is no dispute in this case that KR is an "employer" as defined by the statute, 29 U.S.C. § 2101(a)(1). Additionally, the defendant admits that the action taken on June 26, 1989, constituted a mass layoff or plant closing as defined by the Act, Doc. 28, Pretrial Order, Part III.(b), and that no notice of the plant closing or mass layoff was given until June 26, 1989. *Id.,* Part III.(c). "Affected employees" are employees "who may reasonably be expected to experience an employment loss as a result of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5). An "employment loss" means

(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6 month period.

29 U.S.C. § 2101(a)(6).

### A. *May 18, 1989 Layoff*

■ Plaintiffs contend that the group of 156 employees who were indefinitely and temporarily laid off on May 18, 1989, and who were not recalled to work prior to June 26, 1989, were due the same notice as was due the employees on KR's active payroll on June 26; that workers on temporary layoff who have a reasonable expectation of recall are counted as employees in order to determine coverage under the Act; that under 29 U.S.C. § 2102(d), employees who

sustain an employment loss in an action which involves fewer employees than are needed for a plant closure or mass layoff under WARN are to be counted with a group suffering an employment loss within 90 days thereafter if, in the aggregate, the groups meet the threshold levels for coverage under the Act [*see* Doc. 43].

The defendant contends that because the layoff of the 159 employees at issue on May 18, 1989, does not constitute a "mass layoff"; *i.e.*, 159 employees was not 33% of the Harriman work force on May 18, 29 U.S.C. § 2101(a)(3)(B)(i)(I) and is less than 500, 29 U.S.C. § 2101(a)(3)(B)(ii), KR was not legally obligated to provide such employees with advance notice of the layoff [*see* Doc. 40].

The layoff of the 500 employees on May 18, 1989, does not constitute a "mass layoff" because all but 159 of these employees were recalled to work prior to June 26, 1989. Thus, all 500 employees were not laid off for a period in excess of six months, did not suffer an "employment loss" as defined by the statute, 29 U.S.C. § 2101(a)(6)(B), and ,were, therefore, not "affected employees", § 2101(a)(5), entitled to notice. Although the remaining 159 employees did suffer an "employment loss" because their temporary layoffs became permanent on June 26, 1989, the layoff of this group of employees did not constitute 33% of the Harriman work force on May 18, 1989, when the active payroll at Harriman contained 959 or more employees, *see* plaintiffs' Exhs. 18 and 19. Thus, the layoff of these employees did not constitute a "mass layoff" as defined by 29 U.S.C. § 2101(a)(3). Further, I find that 29 U.S.C. § 2102(d) is not applicable to the facts of this case. Section 2102(d), on its face, requires that *each* group of employees suffering an employment loss at a single site of employment within 90 days involve less than the minimum number of employees specified in § 2101(a)(2) or (3). *See Maxim, supra.* The layoff on June 26, 1989, involved more than 50 employees and greater than 33 percent of the Harriman work force. 29 U.S.C. § 2101(a)(3).

29 C.F.R. § 639.3(a)(1) provides, however, that

> [w]orkers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. An employee has a "reasonable expectation of recall" when he/she understands, through notification or through industry practice, that his/her employment with the employer has been temporarily interrupted and that he/she will be recalled to the same or to a similar job.

*Federal Register,* Vol. 54, No. 75, April 20, 1989. *See also Damron v. Rob Fork Mining Corp.,* 739 F.Supp. 341 (E.D.KY.1990). In *Damron, supra,* the Court held that

> [a] person who has been laid off is not terminated but may, on the facts of the particular situation, harbor some expectation that he will be returned to full employment with that employer. That person, therefore, would reasonably experience an "employment loss" by virtue of a business closing that results in actual termination, raising the WARN Act's required 60 days notification.

*Id.* The evidence is undisputed that the 159 employees at issue here were *temporarily* laid off on May 18, 1989, for an indefinite time, Testimony of Prochaska, T.T. at 145; that KR intended to recall these individuals to work, Testimony of Pilcher, T.T. at 124–125; Testimony of Prochaska, *id.;* and that KR simply did not know, at the time, exactly when these employees would be recalled. *Id.* Further, I find that the fact that 111 of the other employees placed on indefinite temporary layoff were recalled certainly enhanced the subject 159 employees' expectation that they too would be recalled.

The undersigned finds that these 159 individuals were "employees" of KR on June 26, 1989, when their employment was permanently *terminated;* that they suffered an employment loss on that date; and that they were, therefore, "affected employees" entitled to the same notice as any working employee terminated on June 26. It is my opinion that a finding to the contrary would be inconsistent with the meaning and purpose of the Act in light of the fact

that the defendant led these 159 people to believe that they were going to be recalled to work at some point in the near future; that, in fact, 111 of the other employees on indefinite temporary layoff had been recalled; and that, absent the belief that they would be recalled to work, this group of employees could have been seeking other employment or training in an effort to successfully compete in the job market. *See Maxim, supra.*

### B. *June 26, 1989, Layoff*

There is no dispute that on June 26, 1989, there was a mass layoff or plant closing at the defendant's Harriman plant and that all employees terminated on that date suffered an "employment loss" and were "affected employees" entitled to notice in accordance with the WARN Act.

### III. BUSINESS CIRCUMSTANCE EXCEPTION

The defendant contends that the closing of the Harriman plant was caused by the irrevocable loss of the JCP account, the plant's largest and most profitable customer; that the loss of this business was not reasonably foreseeable on April 26, 1989, the date that notice would have been required; that, instead, the loss of the JCP business was sudden, dramatic, and unexpected; that KR provided plaintiffs with as much notice as was practicable; and that it did not violate the notice requirements of the WARN statute.

> 29 U.S.C. § 2102(b)(2)(A) provides that [a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

29 C.F.R. § 639.9(b)(1) and (2) explain that

> [a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termi-

nation of a major contract with the employer, ... might ... be considered a business circumstance that is not reasonably foreseeable....

> The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market....

### A. *Causation*

■ The plaintiffs first contend that the loss of the JCP business was not the cause of the Harriman plant closure. Rather, plaintiff contends that the Harriman plant had been losing money prior to JCP's withdrawal of its business and that the loss of the JCP account was simply the "last straw" necessary for a decision to close the plant; and that the Harriman plant was old and inefficient and had reached the "end of its economic life."

Mr. Pilcher testified that Mr. Bob Obear was a consultant hired by him to act as a "surrogate general manager," Testimony of Pilcher, T.T. at p. 2–109, until he got a management team on board; and that although Mr. Obear was of the opinion that the Harriman plant was reaching the end of its economic life and that it would take a "massive effort" to cure the problems at Harriman if disaster was going to be avoided, KR was, in May of 1989, mounting a massive effort to cure the problems at Harriman through the efforts of the task force. Testimony of Pilcher, T.T. at 2–153–154; 2–159–160. Mr. Charles LeGrand, Vice President of Manufacturing in charge of manufacturing services with responsibility for research and development and product development for the hosiery styles manufactured at Harriman, testified at his deposition that KR went to extraordinary lengths to make sure it did not lose the JCP account and that "[t]here was no question in [his] mind that Kayser–Roth was trying to do everything they could to salvage the account." Plaintiff's Exh. 7, LeGrande Deposition, at p. 23. Mr. Pilcher

further testified that in March of 1989, he had no intention of closing the Harriman plant in the Sheer Hosiery Division, Testimony of Pilcher, T.T. at p. 2–108; that, in fact, at this time he had only been with KR since January, 1989, and was still "getting to know the company," *id.;* that he was trying to formulate strategies to develop the department specialty store business, *id.,* T.T. at 2–108–109; that he was trying to determine how to increase or "grow" the department specialty store business, *id.,* T.T. at 2–109–110; and that the last thing he wanted to do was to cut off his operations by closing a plant. *Id.,* T.T. at 2–110. When asked why he did not continue to pursue additional business after JCP withdrew its account, Mr. Pilcher explained that in light of the extensive quality problems which led to the loss of the JCP account, it would have been hard to convince other customers that KR had a quality product to sell. Testimony of Pilcher, T.T. at 2–110. Finally, Mr. Pilcher testified that he fully intended to keep the plant open prior to the loss of the JCP business. *Id.,* T.T. at 2–137.

The undersigned found Mr. Pilcher to be a credible witness. The fact that the Harriman plant was experiencing overcapacity problems prior to the loss of the JCP account, standing alone, does not demonstrate that it was the overcapacity problem, rather than the unexpected loss of the JCP account, which precipitated the closing of the Harriman plant. For example, Mr. LeGrande testified as follows:

> [T]here were some discussions going on as to what we might have to do to reduce the overall capacity of the division because we were not selling enough goods to utilize all the capacity that was available.
>
> But, certainly, in my mind, I would have thought that the Dayton Plant would have been closed. Not the Harriman Plant.
>
> Q Well, I'll ask you about that in a minute. Let me ask you. You say there were conversations going on about how to reduce the overall capacity that the company had before it became a question that you might lose the J.C. Penney account?
>
> A Yes.
>
> Q Do you recall when those conversations occurred, or those discussions, and who you heard having those discussions?
>
> A Well, they probably went on every year for the last ten years where you'd discuss capacity and volume. We had had excess capacity off and on over a whole period of time. So, you are continually studying how do you match up capacity with what volume that you see, and then you go to somebody and you talk it through. And somebody says, "We're going to sell this much, and you can sell this much."
>
> You go through all the hypothesis, so I would say that any business as volatile as ours, if you're not doing that all the time, you're not at least trying to do your job.

Plaintiff's Exh. 7 at pp. 25–26, dep. of LeGrand.

The evidence is clear that the Harriman plant operated profitably *only* as a result of the JCP account; that a substantial effort was put forth by KR to save the JCP account, and thus, the plant, including a large expenditure of funds ($1.3 million), defendant's Exh. 52 at unnumbered p. 1, and manpower, defendant's Exh. 22; and that once the JCP account was lost, the operation of the Harriman plant was no longer economically feasible. In light of the foregoing, I find that the mass layoff occurring at the defendant's Harriman plant on and after June 26, 1989, was *caused by* a business circumstance; *i.e.,* the loss of the JCP account. The question presented is whether that business circumstance was reasonably foreseeable on April 26, 1989, *see* 29 U.S.C. § 2102(b)(2)(A); 29 C.F.R. § 639.9(b) and (b)(1), and if not, when it became reasonably foreseeable such that notice was required to be given under 29 U.S.C. § 2102(b)(3).

### B. *Reasonably Foreseeable*

█ For reasons indicated more fully below, I find that on April 26, 1989, the date that notice would have been required, 29

U.S.C. § 2102(b)(2)(A), the defendant did not foresee and should not have reasonably foreseen losing the JCP account.

No one disputes that JCP and KR had been doing business together for approximately 30 years, *see* defendant's Exh. 45; that in January, 1989, due to an increase in customer complaints JCP began auditing or inspecting the product manufactured at the Harriman plant; and that as a result of several failed audits between January and March, 1989, KR lost style no. 609 to Ithaca Industries. Mr. Kapplow testified, however, that the removal of style no. 609 was only temporary until KR could rectify the problems at the Harriman plant. Plaintiff's Exh. 3, Kapplow dep. at p. 14. Mr. Kapplow further testified at his deposition that after the March meeting in Dallas and the loss of style 609, Walt Pilcher became involved in the situation, *id.*, p. 16; that he told Mr. Pilcher that JCP certainly wanted to keep KR as its vendor but that if "things didn't start getting fixed pretty soon [JCP] would have to take more drastic action than [it] took on the first go around," *id.* pp. 16–17; that Mr. Pilcher assured him that he was going to give the Harriman plant his personal attention, *id.* at 17; that he never gave Mr. Pilcher a specific date by which the problems had to be resolved; and that he was just looking for "a trend that it would start improving," *id.* at 19. A task force was formed by March 28, 1989, and scheduled to begin work on April 3, 1989. Although KR failed seven of twelve audits between April 5 and April 26, 1989, there is no indication that JCP expected or reasonably could have expected an *immediate* turn around in the substantial quality problems the Harriman plant was experiencing. The task force itself recognized that it would take some time to start a trend of improvement at the Harriman facility as evidenced by the long range dates utilized in the task force plan. *See, e.g.,* defendant's Exh. 8; Defendant's Exh. 26. Dot Rainey visited the Harriman and Lumberton plants on May 1, 2, and 3, 1989, and indicated during this trip that the defendant had a minimum of 60 days to straighten things out at Harriman. Testimony of Malloch, T.T. at 2–81–83; plaintiff's Exh. 5 at pp. 28–29; Testimony of Pilcher, T.T. at 2–120. Mr. Poole testified that during Ms. Rainey's visit KR personnel showed her the things that were being done to correct the quality problems the plant was experiencing; that Ms. Rainey was favorably impressed and had stated she was pleased with what she saw; that she was told that some of the changes might take several months; and that she seemed "comfortable" with that idea. Testimony of Poole, T.T. at 97. On May 3, 1989, Ms. Rainey met with KR's Research and Development people, which meeting was described as "[a]ll in all, ... a very upbeat meeting." Defendant's Exh. 20. On May 17, 1989, in a memo to Bill Cothran from Dom Cerchio, Mr. Cerchio stated the following:

> As discussed with you today, Dot Rainey would like to have new samples of the above two sizes 3X and 4X style 934] with results of wear tests. She is anxious to get started with this new queen size.
>
> Dot will be in the New York office on Tuesday, 5/30/89, to work with us and would like to have these new samples.

Defendant's Exh. 25. A memorandum dated May 16, 1989, from Charles Poteat to Bob Prochaska outlines the Harriman plant status and lists projects with initiation dates into August, 1989, defendant's Exh. 26. A "notice" approved for posting on May 19, 1989, by Kenneth Keller, KR's General Manager, states the following:

> You all passed the J.C. Penney audit done this Wednesday and Thursday. Congratulations!
>
> Penney's will be auditing approximately once a week for an indefinite amount of time. Passing this audit was a good first step in showing one of our major customers we know what we are doing and we are doing it right. We need to maintain our vigilance on quality. We need to pass the next Penney's audit and have two in a row.
>
> Again Congratulations and Thank You! We are going to succeed!

Defendant's Exh. 27. Between May 2 and May 9, KR failed two audits and passed

two audits; but, between May 10 and May 24, KR passed 8 audits in a row and failed only one. Defendant's Exh. 61.

The undersigned finds that the foregoing evidence demonstrates that KR reasonably did not anticipate losing the JCP account on or after April 26, 1989, until the May 25 meeting in Dallas. In fact, as of May 1, 1989, it appeared that KR had at least until July 1, 1989 (60 days from May 1), to demonstrate improvement at the Harriman plant.

■ The record is undisputed, however, that at a meeting held on May 25, 1989, in Dallas, Texas, between Art Kapplow, Dorothy Rainey, Dom Cerchio, and Jerry Poole, Mr. Kapplow announced JCP's decision to remove all major JCP business from the Harriman plant. Defendant's Exh. 43. This decision was confirmed on May 26, 1989. *Id.*

In light of the improved audit results and in light of Ms. Rainey's indications that KR would at least be given until July to demonstrate substantial improvement, it is the undersigned's opinion that the decision announced May 25, 1989, that KR was losing JCP's business was a "sudden, dramatic, and unexpected action outside [KR's] control." 29 C.F.R. § 639.9(b)(1). The undersigned further finds, however, that on May 25, 1989, KR knew that it had lost all but an insignificant portion of the JCP account. This fact was confirmed on May 26. No one questioned Mr. Kapplow's authority regarding the decision to cease doing business with KR. Although Mr. Pilcher testified that he did not believe that this was a firm and irreversible decision, Mr. Pilcher's subjective belief that JCP's decision was not final is not relevant to KR's duty to give notice under the statute. Mr. Poole was informed at the May 25 meeting that management at JCP was fully aware of this decision. As previously stated, "[t]he employer must exercise such commercially reasonable business judgment as would a similarly situated employer." 29 C.F.R. § 639.9(b)(2). I find that Mr. Pilcher's reliance on his own personal beliefs as opposed to the decision to withdraw JCP's business from KR announced as fact by personnel having the authority to speak for JCP and in light of the totality of the objective factual circumstances was not commercially reasonable.

Accordingly, I find that KR knew on Thursday, May 25, 1989, that the JCP account was lost and that without the JCP account, it could not keep the Harriman plant open; and that it was reasonably practicable for KR to issue notice of the mass layoff or plant closure within two working days, *i.e.*, on May 30, 1989. JCP's refusal to reconsider its May 25 decision at the June 21 meeting was not "sudden, dramatic and unexpected" in light of all of the objective factual circumstances. *See* 29 C.F.R. § 639.9(b). Thus, I find that between May 30, 1989, and June 26, 1989, when notice was actually given, the defendant was in violation of the WARN Act and that plaintiffs are entitled to be compensated accordingly.

## IV. CREDIT FOR SEVERANCE PAY

29 U.S.C. § 2104(a)(2) provides that

[t]he amount for which an employer is liable under paragraph (1) shall be reduced by—

. . . . .

(B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and

. . . . .

The defendant contends that it made severance payments to its employees of up to four weeks; that it was under no obligation to provide such payments; and that, therefore, KR is entitled to credit under 29 U.S.C. § 2104(a)(2)(B) for all severance payments.

Plaintiffs do not dispute this except to the extent that plaintiffs claim that the defendant was obligated to pay severance pay to its salaried, as opposed to hourly wage, employees in accordance with KR's "Human Resources Policies and Procedures Manual." Plaintiffs' Exh. 20, Exh. 1 attached thereto.

■ It is well settled law in Tennessee that "[t]he employer-employee relationship is contractual in nature." *Hamby v. Genesco, Inc.*, 627 S.W.2d 373, 375 (Tenn.App. 1981), *application for permission to appeal denied, id.* (1982). An employee handbook can be part of an employment contract if the specific language of the handbook shows contractual intent by *guaranteeing* in some way the benefits set forth therein. *Smith v. Morris*, 778 S.W.2d 857, 858 (Tenn.App.1988), *application for permission to appeal denied, id.* (1989) (citing *MacDougal v. Sears, Roebuck & Co.*, 624 F.Supp. 756 (E.D.Tenn. 1985)).

■ The severance policy at issue in this case provides, *inter alia*, the following:

GENERAL

At the sole discretion of the Company, payroll severance payments may be made to eligible salaried employees who are involuntarily terminated from the Company (except for cause).... No one is automatically entitled to notice of termination or severance pay under any circumstances, *except as provided by law.*

.    .    .    .    .

J. *Amendment, Termination & Interpretations*

The Company reserves the right to amend or terminate this policy at any time, with or without notice, and to interpret the policy and its applications from time to time as necessary.

Plaintiffs' Exh. 20, Exh. 1 attached thereto, Policy/Procedure No. 140–6 at pp. 1 and 4.

The undersigned finds that the foregoing language does not show contractual intent; that there is no guarantee that any salaried employee will receive severance pay; that the severance policy could be modified or terminated at any time; that, therefore, any plaintiffs who were salaried employees of KR had absolutely no right or entitlement to severance pay, *see Smith, supra* (court held that an employee handbook which did not guarantee any benefits and could be periodically evaluated and modified was not a part of an employment contract); and that the defendant's payment of severance pay to its salaried employees was voluntary, unconditional, and not required by any legal obligation. *See* 29 U.S.C. § 2104(a)(2)(B).

For the reasons indicated, the amount for which the defendant is ultimately determined to be liable shall be reduced by severance payments made to both hourly and salaried employees. 29 U.S.C. § 2104(a)(2)(B).

## V.  BENEFITS RECOVERABLE

■ 29 U.S.C. § 2104(a)(1) provides, *inter alia*, that

[a]ny employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—

(B) benefits under an employee benefit plan described in section 1002(3) of this title, including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

The plaintiffs contend that they are entitled to the greater of

(1) the cost to the defendant of providing benefits;  or (2) the benefit of the insurance in the event of a covered medical expense, death or other incident during the violation period;  or (3) a combination thereof.

Doc. 43 at p. 33;  that the term "benefits" as used in the Act means not only the amounts that would actually have been received by an employee making a claim, but also the value of the coverage provided to the employee under the benefit plan, whether or not a claim is made. *Id.*

The defendant contends that plaintiffs are only entitled to receive benefits if they would otherwise have been entitled to receive them if they had remained on the payroll during the violation period, and that if plaintiffs incurred costs in obtaining replacement benefits, KR would be responsible for reimbursing plaintiffs for the cost of benefits during the violation period [*see* Doc. 41].

The undersigned finds that the intent of 29 U.S.C. § 2104(a)(1)(A) and (B) is to "make the plaintiff whole." Since there is no decision reported or unreported construing the benefits provision of the WARN Act, the undersigned relies for guidance on age discrimination cases presenting a similar issue.

After examining the language of the statute and the legislative history, I am persuaded by the reasoning of the United States Court of Appeals for the Fourth Circuit in the case of *Fariss v. Lynchburg Foundry,* 769 F.2d 958 (4th Cir.1985), and am confident that the application of such reasoning to the statute at issue reconciles the statutory language with the legislative history and intent.

In *Fariss, supra,* the court was presented with the question of "what damages are due in an ADEA case for loss of a life insurance policy provided to employees by the employer as a fringe benefit." 769 F.2d at 964. The court first noted that

> [o]verwhelming judicial authority recognizes that employers guilty of age discrimination are liable for fringe benefits they would have provided to employees as well as back wages under the ADEA (citations omitted). Thus, the value of health or life insurance provided by the employer (citations omitted) is recoverable where age discrimination has occurred.

*Fariss, id.* at 964–965. Similarly, the WARN Act provides that employers are liable for benefits they would have provided employees as well as wages during the period of violation. The question in this case, as well as in the *Fariss* case, concerns the proper measure of value of those benefits.

In determining the value of the benefits, the *Fariss* court rejected the contention that the proceeds of the insurance are the proper measure of value. 769 F.2d at 965. Instead, the court held as follows:

> We do not think Congress intended, as a general rule, to transform employers into insurers merely because an insurance policy is part of the compensation for employment. Although the insurance policy is the benefit an employee contracts to receive, the employer does not undertake to cover personally risks of loss of life or illness by purchasing a policy for employees.... In many instances, an obligation to pay the full proceeds of a life or health insurance policy could be staggering, amounting to many hundreds of thousands of dollars. The disincentives to providing employees insurance as a fringe benefit are evident; faced with such enormous potential liability, employers could be expected to consider compensating employees entirely in cash. Those courts prepared to place on the employer the risk that an employee will have an insured loss after termination misconstrue the "make whole" function of the ADEA.... The value of being insured for a given period is precisely the amount of the premiums paid.

*Fariss,* 769 F.2d at 965.

It is the undersigned's opinion that the values of the employee benefits at issue here are the premiums paid by the defendant. Valuing the benefits in this way reconciles the language of the statute rendering the employer liable for "benefits under an employee benefit plan described in section 1002(3) of this title, *including* the cost of medical expenses incurred...." If Congress had intended the benefits to be valued only in terms of expenses incurred during the period of violation which would have been covered, the language "including the cost of ..." would be mere surplusage. Statutory construction begins with the language of Congress and "we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" *American Tobacco Company v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (citation omitted). "Thus, '[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Id.* (citation omitted).

"Include" is defined as "[t]o have as a part or member; be made up of, at least in part; contain." *The American Heritage Dictionary of the English Language,* 665 (New College Edition 1976). Thus, medical

expenses *incurred* which would have been covered during the violation period make up *only a part of* the employer's liability for benefits. The other part of the employer's liability, therefore, must be satisfied by paying the value of the benefits themselves for the period of violation.

The foregoing interpretation is further supported by 29 U.S.C. § 2104(a)(2)(C), which allows the employer to reduce his liability by

> any payment by the employer to a third party or trustee (such as *premiums for health benefits* or payments to a defined contribution pension plan) on behalf of and *attributable to the employee* for the period of violation (emphasis added).

"Attribute" is defined as "[t]o regard or assign as *belonging to. . . ."* The American Heritage Dictionary of the English Language, id. at 85 (emphasis added). The undersigned finds that the foregoing language demonstrates that Congress views the premiums paid for health and other benefits during the violation period as *belonging to* the employees just as the employees' wages during the violation period belong to the employees.

For all of the reasons indicated, I find that plaintiffs may recover the value of any benefits they would have received during the period of violation (*i.e.,* the premiums paid for said benefits), and for any medical expenses incurred during the violation period which would have been covered. Additionally, if any of the plaintiffs obtained substitute insurance, such plaintiffs may recover any additional premiums paid for comparable individual policies beyond what the defendant would have paid for group insurance. *See Fariss,* 769 F.2d at 966.

## VI. GOOD FAITH

29 U.S.C. § 2104(a)(4) provides that

[i]f an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, re-

duce the amount of the liability or penalty provided for in this section.

The defendant contends that it gave notice within two working days of the decision to close the Harriman plant which was as soon as was reasonably practicable; that defendant kept the plant open for two-thirds of the work force until September; that defendant granted the terminated employees severance pay; that defendant made its normal contribution to the United Way on behalf of KR; and that, therefore, the court should exercise its discretion in favor of reducing the defendant's liability in accordance with § 2104(a)(4).

■ The undersigned finds that the defendant's conduct *after* the violation is not relevant to the determination of good faith contemplated by the statute. The pertinent inquiry in deciding whether to exercise the court's discretion in favor of reducing the defendant's liability is the defendant's conduct *prior* to the notice; *i.e.,* whether the act or omission which violated this chapter was in good faith and whether the employer reasonably believed that the act or omission was not a violation of this Act, 29 U.S.C. § 2104(a)(4).

■ The undersigned finds that the defendant's beliefs that it did not need to give notice of the plant closure until after the meeting between KR and JCP management on June 21, 1989, and that it was not in violation of the statute between May 25 and June 26, 1989, were not reasonable. Mr. Fooshee testified that the fact that the Harriman plant could not be economically operated after the loss of the plant's most profitable business, JCP, was a "no brainer." Testimony of Fooshee, T.T. at 2–6. It is undisputed that on May 25, 1989, Mr. Arthur Kapplow and Ms. Dorothy Rainey informed Jerry Poole and Dom Cerchio that KR was losing the majority of the JCP business and that this fact was confirmed on May 26, 1989. Defendant's Exh. 43; Testimony of Pilcher, T.T. at pp. 2–179–180. Mr. Pilcher testified that although he did not believe that Ms. Rainey and Mr. Kapplow were speaking without authority regarding this decision, he did not believe

that it was a "firm and final, without recourse, decision." *Id.*, T.T. at pp. 2–175–176. Mr. Pilcher further testified, however, that he did not make any inquiries of Mr. Kapplow as to whether the decision was irreversible. *Id.*, T.T. at p. 2–176. Mr. Pilcher, as well as other KR employees, were aware that Ms. Rainey had been "scouting" other hosiery mills at which to place KR's business. *Id.*, T.T. at pp. 2–178–179; defendant's Exh. 7. Mr. Pilcher's deposition was taken on November 13, 1989, wherein he testified that he started seriously considering the possibility of closing the Harriman plant in May. Plaintiffs' Exh. 9, Pilcher deposition at p. 14. On June 8, 1989, Dom Cerchio met with Ms. Rainey in New York, at which time Ms. Rainey supplied KR with a schedule of JCP's demands and when KR was to stop supplying JCP with hosiery. Defendant's Exhs. 39 and 44. On June 13, 1989, Ms. Rainey supplied Mr. Cerchio with a list of JCP's new manufacturers. Defendant's Exh. 44. Even assuming that Mr. Pilcher's subjective disbelief of JCP's decision to sever its business relations with KR was reasonable, the defendant could have given conditional notice within a reasonable time after May 25, 1989, in accordance with 29 C.F.R. § 639.7(a)(2) and (3), but defendant chose not to do so. Although the notice required by the Act must be specific, 29 C.F.R. § 639.7(a)(4) provides that

> [t]he information provided in the notice shall be based on the best information available to the employer at the time the notice is served. It is not the intent of the regulations that errors in the information provided in a notice that occur because events subsequently change or that are minor, inadvertent errors are to be the basis for finding a violation of WARN.

Accordingly, for the reasons indicated, I do not find the "good faith" envisioned by the statute and necessary to serve as a basis for a reduction in the defendant's liability in this case pursuant to 29 U.S.C. § 2104(a)(4).