Jackson D. CHESTNUT, et al.,

v.

STONE FOREST INDUSTRIES, INC.

Civ. A. No. 89–50135.

United States District Court,
N.D. Florida.

March 31, 1993.

Jerry Traynham, Patterson & Traynham, Tallahassee, FL, for plaintiffs.

David Stefany, Hogg, Allen, Norton & Blue, Tampa, FL, for defendant.

## ORDER

COLLIER, District Judge.

This is a class action suit brought pursuant to the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* (WARN) by both present and former em-

ployees of Defendant, Stone Forest Industries, Inc.'s (SFI), Graceville, Florida lumber mill. Plaintiffs allege that they were not afforded the requisite 60–day notice as mandated by WARN before a covered employer may initiate a "mass layoff" of its employees. *See* 29 U.S.C. § 2102(a). They seek statutory relief in the form of back pay, pre-judgment interest, costs, and attorney fees.

Trial was held on February 16–17, 1993. At trial, the defendant argued that it should escape liability under WARN because the mass layoff which occurred on May 18, 1989 was caused by business circumstances that were not foreseeable as of the date the 60–day notice would have been required.[1] *See* 29 U.S.C. § 2102(b)(2)(A). This Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5). Upon review of the evidence submitted at trial, as well as the record as a whole, the Court finds that the defendant qualifies for the exception set forth in section 2102(b)(2)(A).

*Background*

SFI, a wholly-owned subsidiary of Stone Container Corporation, produces lumber throughout the United States. SFI's eastern division includes a pine lumber mill in Graceville, Florida which produces primarily southern yellow pine lumber. During the time period relevant to this case, SFI employed an average of 175 persons at the Graceville mill on a schedule of two 40–hour shifts per day.

Prices in the lumber industry are largely determined from a working model of the pure market economy, with buyers and sellers bartering with one another on nearly a daily basis in an effort to achieve the best deal. As a result, the market for finished southern yellow pine lumber tends to be somewhat volatile, making it difficult for mill operators to prepare economic forecasts.[2] Consequently, buyers and sellers of southern yellow pine lumber rely upon weekly industry publications, such as *Random Lengths,* for guidance in predicting market conditions which affect demand in the industry. Not surprisingly, then, during the years 1988–1989, the time period relevant in this case, management at the Graceville mill relied upon *Random Lengths'* regional pricing data for market prices to determine its operating margins.[3]

For several months prior to August 1988, Graceville's sales figures for southern yellow pine had been fairly strong, averaging a price of $243/MBF.[4] In August 1988, however, the price dropped dramatically, from $225.62/MBF to $196.49/MBF. This negative trend continued until November 1988 when the price increased to $216.13/MBF.[5] Thereafter, from November to March 1989, the price averaged $217/MBF, a rather respectable average considering that the average from August to October was a depressed $197/MBF. In April 1989, however, the price again dropped dramatically to $196.76/MBF, the lowest price since September 1988. Faced with such dismal conditions, SFI announced its decision on April 19 to completely shutdown the Graceville mill on a temporary basis, effective April 28. This decision was based on management's fear of devastating losses were the plant to continue at its then current level of operation. Upon shutdown of the plant on April 28, management began

---

1. The question of WARN's applicability to the facts of this case was decided on the undisputed facts at the summary judgment stage (*see* doc. 64).

2. Graceville used two forecasting formats during this time period, a rolling three-month forecast · and a one-month forecast.

3. Although Graceville's management relied predominately upon *Random Lengths'* as a guide in this regard, the numbers were also prepared from readily determinable data, such as employee wage rates, the number of planned operational hours, and the previous month's rate of productivity.

4. "$____/MBF" refers to an average price per thousand board feet sold. Since the quality, quantity and dimensions of southern yellow pine lumber affect sales price, the "$____/MBF" is an industry standard which reflects the average of all lumber sold during a given period of time.

5. During this time, specifically in October, management reduced operations at the Graceville plant from two 40–hour shifts to two 32–hour shifts. SFI also laid off eight maintenance employees. These actions were taken, according to SFI, because the fall is typically not a period of the year in which lumber mill operators can expect a strong market.

considering other operational options, aside from the two 40–hour shifts, which would create the greatest efficiency of operation for the mill.

Serious consideration was given to the idea of reducing the operational mode to one-shift upon resumption of operations, and after considering several *pro formas*, management decided to go with this option. Accordingly, on May 3, 1989, the decision was made to bring the mill back into production on one 55–hour shift, effective May 30–June 1, 1989.[6] The single 55–hour shift was deemed to be the most efficient mode of operation considering market conditions at that time. As a result of this decision, eighty-one employees were notified on May 18, 1989 that they would be laid-off indefinitely.

## Analysis

WARN requires an employer planning either a plant closing or mass layoff to give notice of such decision to all affected employees at least 60 days prior to the closing or layoff. 29 U.S.C. § 2102(a). The requisite 60–day notification period may be reduced, however, if "the [plant] closing or mass layoff is caused by circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). An employer hoping to rely on this exception must have nonetheless given notice as soon thereafter as was practica-

ble. 29 U.S.C. § 2102(b)(2)(3). Accordingly, the dispositive question before the Court is whether on April 26, 1989, SFI was faced with such dramatic and devastating business circumstances, not reasonably foreseeable on February 26, that its failure to give notice on February 26 should be excused.[7] If this question is answered in the affirmative, then the Court must determine whether notice was given as soon as was practicable after April 26. These are questions of first impression in this circuit.[8]

Because there is so little judicial guidance on the question of what facts might satisfy the exception,[9] the Court has relied primarily on the WARN regulations issued by the Department of Labor in reaching its decision.[10] The regulation relevant to this inquiry reads in pertinent part as follows:

> An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable. A government ordered closing of

6. At the time of this decision, the mill was still in temporary shutdown.

7. Absent the exception, the parties have stipulated that notice should have been given on February 26, 1989, 60 days prior to the date of the layoffs which occurred as a result of the April 28 shutdown.

8. In fact, as the parties have correctly pointed out, application of the unforeseen business circumstances exception to facts such as those found in this case is a question apparently never before addressed by judicial decision.

9. Although factually distinguishable, there are two judicial decisions which have interpreted this exception by written opinion, and which offer some insight into legislative intent. In *Carpenters District Council of New Orleans and Vicinity v. Dillard Dept. Stores*, 778 F.Supp. 297 (E.D.La.1991), a case involving a mass layoff as a result of a merger of two department stores, the

district court reasoned that "Congress intended only that unusual, unexpected and significant events, beyond the control of the employer, would excuse [the employer] from furnishing the full 60 day notice." *Id.* at 307. Similarly, in *Jones v. Kayser–Roth Hosiery, Inc.*, 748 F.Supp. 1276 (E.D.Tenn.1990), a case involving a plant closing as a result of the loss of a major account, the district court adopted the same statutory interpretation, citing the final regulations.

10. Arguably, there may be some problem with applying these final regulations to the facts of this case because the regulations did not become effective until May 22, 1989, approximately 90 days after the defendant's alleged failure to give the appropriate notice, and regulations are not ordinarily applied retroactively. *See Carpenters District Council*, 778 F.Supp. at 307 n. 12. The Court, however, finds that the alleged violation, if any, would have occurred on May 30–June 1, 1989, when the mass layoff was implemented without the requisite 60 day notice, some 8 or 9 days after the regulations went into effect.

an employment site that occurs without prior notice also may be an unforeseeable business circumstance.

20 C.F.R. § 639(9). Section 639(9) further suggests that in determining when business circumstances are not reasonably foreseeable courts should focus on an employer's business judgment, and apply the following test:

> The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.

*Id.; see Jones,* 748 F.Supp. at 1285.

The defendant's argument focuses on the language from section 639(9) which suggests that "an unanticipated and dramatic major economic downturn" might be considered a reasonably unforeseeable business circumstance. Defendant insists that if there were ever circumstances sufficient to satisfy this exception, they are present in this case. Plaintiffs, on the other hand, argue that the defendant should not be permitted to escape liability under the exception because the circumstances precipitating both the April 26 plant closing and the May 30–June 1 layoffs were reasonably foreseeable by SFI as of February 26. Plaintiffs claim that as of December 1988 and January 1989, Graceville's management knew that unless the economic downturn which began in July–August 1988 changed course rather sharply, management soon would be forced to make drastic changes to Graceville's work force.

The crux of plaintiffs' argument focuses on the exception's requirement of reasonableness. Plaintiff maintains that it was unreasonable for management to push ahead toward the brink of economic failure from January through May 1989, when it knew that conditions for the plant were, and had been, so dismal, and when it knew that its forecasting methods were, and had been, routinely overly optimistic. This argument is even more compelling, plaintiffs argue, because SFI was aware of the market's volatile nature and should have known that a sudden shift in price would be a catastrophe for the Graceville plant.

SFI disagrees and argues that in January 1989, management was optimistic that lumber prices had bottomed out and did not expect prices to fall any lower during the first quarter of the year. SFI claims that this argument is substantiated by the fact that during January, SFI management notified its Graceville employees that it would be resuming full production at two 40–hour shifts, rather than the two 32–hour shifts instituted in October 1988, and recalled all eight employees laid off that October. SFI maintains that in addition to this action, SFI's comptroller forecast lumber prices at Graceville as improving from $230/MBF to $240/MBF over the next three month period. SFI urges the Court to find that none of these actions were consistent with a company anticipating a major economic downturn in less than three months.

According to testimony at trial, SFI's optimism was based primarily on what is known as "the spring effect." This is an industry perceived impetus for demand in the southern yellow pine lumber market, beginning in March and lasting through July. Defendant's "spring effect" argument is founded on the premise that demand for southern yellow pine lumber generally increases during the spring months, as treater plants increase their purchases of finished lumber and the moderate weather allows greater opportunity for new construction and repair/remodeling projects.

In addition to "the spring effect," there was trial testimony on at least three other factors which, SFI argues, helped to fuel its optimism during this time. The first factor concerned the conditions then unfolding in the Pacific Northwest. SFI argues that the active efforts of conservationists in the Pacific Northwest had finally paid off, and new laws were significantly reducing the lumber supply in that region. SFI maintains that as a result, mills operating in the southeastern portion of the United States would benefit. Second, SFI argues that Northern Spotted Owl was due to be placed on the Endangered Species List by the National Wildlife Service, suggesting again a decline in the lumber

supply of other regions. Finally, the argument was made that an export tax on Canadian lumber shipments into the United States in effect at that time necessarily created a competitive advantage for U.S. mills.

Plaintiffs dispute SFI's suggestion of a favorable effect with respect to the above three factors. Plaintiffs argue, instead, that the reasonableness of SFI's alleged inability to foresee or anticipate the devastating drop in the market in April should be questioned because management should have realized that the dramatic decline was a possibility based on the tremendous overbuilding of single and multi-family dwellings in the early to mid–1980's, and on the credit squeeze created by the Savings and Loan crisis in the mid- to late 1980's. Plaintiffs argue that management knew housing starts greatly affected the market for southern yellow pine lumber, and that in December 1988, management knew, or should have known, that housing starts had declined every year since 1985.[11] Plaintiffs argue as well that the Savings and Loan crisis was common knowledge, and that SFI should have expected a negative effect on the market based on a decline in the amount of mortgages being extended to new home owners.

■ Irrespective of whether the Court finds any hard data to support either the "spring effect" argument or the argument concerning the other three factors which allegedly contributed to SFI's optimistic outlook during this time, or irrespective of the Court's opinion as to whether SFI knew or should have known of the decline in the market for new housing starts or of the negative effect from the Savings and Loan crunch, none of these factors is of any significance to the Court's ultimate conclusion in this case because although SFI must exercise commercially reasonable business judgment in predicting the demands of the southern yellow pine lumber market, it is not required to accurately predict general economic conditions that also may affect demand for the southern yellow pine lumber which it produces. 20 C.F.R. § 639.9. Each of these

factors represents an economic condition which allegedly affected the market for southern yellow pine lumber during the late 1980's. The Court, therefore, cannot find that SFI should or should not have reasonably foreseen the April crash in prices based on any of these factors.

■ SFI, as the defendant, has the burden to come forth with sufficient evidence to satisfy the exception. As previously noted, the statute imposes a standard of commercial reasonableness, based on what a similarly situated employer would do in predicting the demands of its particular market. At trial, SFI called C.D. Blythe, sales manager for Coastal Lumber Co., a company with a lumber mill in Havana, Florida serving the same market as SFI's Graceville mill.[12] Mr. Blythe testified that his company expected an increase in prices during the time period from February to June 1989. Mr. Blythe stated further that his company did not foresee or anticipate the drastic drop in prices which occurred in April, and that to the contrary, as a result of the company's optimism during the first part of 1989, it took actions to increase productivity at its Havana, Florida mill. Mr. Blythe then testified that instead of reaping the benefit of the expected market conditions at the Havana mill, operating losses during April and May 1989 at the mill were the most devastating of any two-month period during his 23 years as softwood sales manager for the company. Based on the testimony of Mr. Blythe, a similarly situated lumber mill operator, the Court finds that SFI has satisfied its burden.

■ Once SFI satisfies its burden, it is then incumbent upon the plaintiffs to come forth with evidence sufficient to rebut the defense. Plaintiffs, however, have brought forth no factual evidence to rebut Mr. Blythe's testimony, choosing instead to rely on the opinion of their economics expert, Dr. Raymond Canterbury, who testified that based on the negative price trend beginning in February 1989 and continuing into April, SFI's hopes for an improvement in the market in the Spring of 1989 "were little more

---

**11.** Plaintiffs suggest that this was a fact widely known in the industry.

**12.** Mr. Blythe was called as a fact witness.

than wishful thinking."[13] (*see* doc. 88) Plaintiffs contend that Dr. Canterbury's testimony supports their argument that SFI's overly optimistic forecasting methods and the market's volatile nature, made drastic measures at the Graceville mill inevitable if the market suddenly experienced a shift in price. Plaintiffs, thus, insist that the employees should not be made to suffer for SFI's failure to "build 60 days notice to its employees into its calculus for making operational decisions" based on a false hope for market recovery.[14]

Although Dr. Canterbury had no direct experience in trend analysis relative to the lumber industry, the Court does not find this material. He was qualified to give testimony on the question of whether SFI's forecasting was reasonable. The Court, however, is troubled over Dr. Canterbury's application of macroeconomics to formulate his trend analysis, and thus his opinion in this case, when SFI's management testified that it did not employ or utilize the principles of macroeconomics in preparing its forecasts. The statute imposes a standard of commercial reasonableness based on the market predictions of a similarly situated, in this case, lumber mill operator. Plaintiffs have brought forth no evidence suggesting that similarly situated mill operators ordinarily apply macroeconomics in preparing their forecasts. Even if suggestive of SFI's unrealistic or overly optimistic forecasts, nothing in the statute or regulations requires an employer to use the most sophisticated means available to predict the demands of his market. If SFI conducted itself as would a similarly situated lumber mill operator under similar circumstances, and the Court finds that it did, then the statute is satisfied.

The remaining question, therefore, is whether SFI unreasonably ignored the hard economic data, meaning the actual numbers coming out of the Graceville mill, notwithstanding any economic conditions which may or may not have affected its forecasts. Plaintiffs argue that "[i]n December 1988 and January 1989, Stone knew that unless the economic downturn which began in July 1988 changed course fairly dramatically, *a point would soon be reached* which would require drastic changes in the work force, if Stone was to stop the red ink from flowing." (doc. 88) (emphasis added). The Court finds that SFI did not act unreasonably in this regard because the numbers indicate that the average price from October 1988 through February 1989 was $215/MBF. Based on the hard data, then, the Court cannot find that SFI should have anticipated or foreseen the problem in April.

However, even if the Court were inclined to agree and find that SFI did act unreasonably in this regard, there is nothing in the statutory makeup of WARN to suggest that a defendant hoping to avoid liability based on the unforeseeable business circumstances exception must give notice at the initial signs of a declining market *on the chance* that the price of its product will at some later point in time drop dramatically. Such a requirement is unrealistic and not within the spirit of the statute.

The only language in the regulations which arguably speaks to this type of a circumstance reads as follows:

Notice may be given conditional upon the occurrence or nonoccurrence of an event, such as the renewal of a major contract, only when the event is definite and the consequences of its occurrence of nonoccurrence will necessarily, in then normal course of business, lead to a covered plant closing or mass layoff less than 60 days after the event.

**13.** Dr. Canterbury also testified in great detail on the unreasonableness of SFI's failure to consider the decline in the housing market in preparing its economic forecasts, and disputed SFI's suggestion that the Spotted Owl controversy and the Canadian export tax played some role in SFI's optimism. For the reasons given above, the Court cannot impose liability on SFI based on SFI's unreasonable or unrealistic assessment of these factors.

**14.** Along these same lines, plaintiffs argue that "[SFI's] inability to forecast the precise nature of the 'last straw' [did] not make the general economic conditions leading to the failure any less foreseeable." (*see* doc. 88). The Court, however, must point out again that the regulations do not require SFI to accurately predict, or for that matter foresee, general economic conditions that may affect demand for its product.

**938**

20 C.F.R. § 639.7. In this case, based on the volatile nature of the market, a fact recognized and argued by the plaintiffs, the event [the dramatic drop in price], was not definite within the meaning of the regulations, and a conditional notice was not required. Moreover, the regulations frown upon the concept of a "rolling notice:"

> Rolling notice, in the sense of routine periodic notice, given whether or not a plant closing or mass layoff is impending, and with the intent to evade the purpose of the Act rather than give specific notice as required by WARN, is not acceptable.

20 C.F.R. § 639.10. These regulations, thus, support the argument that the type of notice contemplated by the plaintiffs in this case was not required.

Based on the foregoing, the Court finds that defendant has met its burden of proof with respect to the statutory exception and that plaintiffs' have failed to rebut this evidence. SFI exercised commercially reasonable business judgment in predicting the demands of the southern yellow pine market in 1988–1989. The unrebutted testimony of defendant's witness, C.D. Blythe, demonstrated that the dramatic drop in prices in April 1989 was not something reasonably foreseeable by prudent lumber mill operators in February 1989. The actions taken by management at the Graceville mill in early 1989 demonstrate that SFI did not anticipate the downturn. The Court finds further that SFI furnished notice as soon after April as was practicable. There were numerous considerations to be reviewed such as which mode of operation to resume with and, if a layoff was to be implemented, which employees to notify. There were Union considerations as well.

Moreover, the Court finds that the type of notice suggested by the plaintiffs in this case is not legally viable, as it is not provided for under WARN. Finally, based on this ruling, the Court need not address the issue of Mr. Scotty Jordan's status as a potential member of the plaintiff class.

Accordingly, IT IS THE VERDICT OF THIS COURT that the defendant qualifies

for the exception in 29 U.S.C. § 2102(b)(2)(A).