821 F.Supp. 1306 (1993)
INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO and Aeronautical Industrial District Lodge 776, Plaintiffs,
v.
GENERAL DYNAMICS CORPORATION, Defendant.
No. CA-91-0125-C-7.
United States District Court, E.D. Missouri, E.D.
May 24, 1993.
Allison Beck, Gen. Counsel, Owen Herrnstadt, Associate Gen. Counsel, Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO, Washington, DC, Rod Tanner, Yona Rozen, Gillespie Rozen & Tanner, Fort Worth, TX, Jerome A. Diekemper, Diekemper Hammond Shinners Turcotte & Larrew, St. Louis, MO and Art Brender, Fort Worth, TX, for plaintiffs.
John Shepherd and Timothy K. Kellett, Armstrong Teasdale Schlafly Davis & Dicus, St. Louis, MO, Bobby G. Pryor, Paul D. Inman, Karl Nelson, Dallas, TX, and Stephen E. Tallent and Timothy Hatch, Gibson Dunn & Crutcher, Washington, DC, for defendant Gen. Dynamics.

*1307 MEMORANDUM AND ORDER

HAMILTON, District Judge.
Plaintiffs International Association of Machinists and Aerospace Workers, AFL-CIO (the IAM) and Aeronautical Industrial District Lodge 776 (District Lodge 776) bring this action on behalf of former employees of Defendant General Dynamics Corporation pursuant to the Worker Adjustment and Retraining Notification Act (the Warn Act).[1] 29 U.S.C. § 2101 et seq. The WARN Act requires certain employers to give sixty days advance notice of mass layoffs. Plaintiffs allege that Defendant terminated the employment of approximately 1200 former employees on January 7, 1991. Plaintiffs further allege that Defendant failed to issue WARN notices sixty days prior to the layoff on November 8, 1990. In addition, Plaintiffs maintain that the notice issued on December 21, 1990 was not in compliance with the WARN Act because a copy of the notice was not sent to the IAM.
Defendant counters that the layoffs were due to the unexpected cancellation of its contract to develop and produce the A-12 aircraft for the United States Navy. Defendant contends that its failure to issue WARN notices on November 8, 1990 is therefore excused under the unforeseen circumstances exception to the WARN Act requirements. 29 U.S.C. § 2102(b)(2)(A). Finally, Defendant maintains that its failure to send a December 21, 1990 notice to the IAM was not a violation of the WARN Act because it was the longstanding practice of the parties to assume that notice to District Lodge 776 constituted notice to the IAM.
On February 3, 1992 this Court denied Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment as to the time between December 21, 1990 and January 8, 1991. The case proceeded to trial and the Court heard evidence on this matter August 31, September 1, 2, and 3.

Findings of Fact
1. The IAM is an international labor organization engaged in representing employees for purposes of collective bargaining in industries affecting interstate commerce. The IAM's headquarters is located in Upper Marlboro, Maryland.
2. District Lodge 776 is affiliated with the IAM and is a labor organization engaged in representing employees for purposes of collective bargaining in industries affecting interstate commerce. District Lodge 776's headquarters is located in Fort Worth, Texas.
3. General Dynamics recognizes the IAM and District Lodge 776 as the exclusive collective bargaining representatives of all hourly rated production and maintenance employees, timekeepers, inspectors and tooling reproduction technicians of General Dynamics' Fort Worth Division. (Plaintiffs' Exh. 1, Collective Bargaining Agreement, Art. 1, p. 1.)
4. General Dynamics is a corporation organized and existing under the laws of the State of Delaware with permits to do business in the States of Missouri, Texas, and Oklahoma. At all relevant times General Dynamics' headquarters was located in St. Louis, Missouri. General Dynamics is engaged in the business of developing and manufacturing aircraft, aircraft parts, and equipment pursuant to contracts with the United States Government and others.
5. On January 13, 1988, the United States Department of the Navy awarded a contract to General Dynamics and McDonnell Douglas Corporation for the full scale engineering development of the A-12 aircraft, a medium attack jet utilizing sophisticated technologies. On January 7, 1991, the Government terminated the A-12 contract.
6. The A-12 contract was a fixed-price contract with a target price of approximately $4.4 billion. The Government was required to pay all costs up to that amount. Costs between the target price of $4.4 billion and the ceiling price of approximately $4.8 billion would be shared by the Government and the contractor; the Government would pay 60 percent of the costs and the contractors would pay 40 percent. The contractors were responsible for all costs above the ceiling.
7. In December, 1989, Secretary of Defense Richard Cheney directed a Major Aircraft *1308 Review (MAR) of four ongoing development programs including the A-12 program. The primary purpose of the MAR was to determine the impact of changes in world events, including the fall of the Berlin Wall, on the future need for these aircraft. Secretary Cheney also faced mounting concerns about the federal budget deficit and congressional demands for military budget reductions. (Testimony of Dr. Lawrence Korb, TR 20.)
8. On April 26, 1990, Secretary Cheney presented the results of the MAR to the House Armed Services Committee. At that hearing, Secretary Cheney testified that the A-12 was "one of our most urgent requirements" because it was necessary to replace the aging A-6E fleet. Secretary Cheney recommended continued funding of the A-12 with a reduction in the total buy from 858 aircraft with a maximum production rate of 48 a year to 620 aircraft with a maximum production rate of 36 a year. (Plaintiffs' Exh. 40, Department of Defense Major Aircraft Review, pp. 700-701.)
9. Shortly thereafter, it became apparent that General Dynamics and McDonnell Douglas were experiencing considerable difficulties with the A-12 program and were unlikely to complete the project on time and within budget. In May, 1990, the A-12 contractors discovered that production of the A-12 would be more difficult than expected due to unforeseen problems with the manufacture of the "big ribs" of the airplane. (Testimony of Blane Scheideman, TR 16.) In June, 1990, Mr. Scheideman, General Dynamics' principal government contracts officer, received results of a cost of completion study conducted by the Red Team. (The Red Team was a committee convened by Stanley Pace, Chief Executive Officer and Chairman of the Board of Directors of Defendant General Dynamics, and John McDonnell, Chief Executive Officer of McDonnell Douglas Corporation.) (Plaintiffs' Exh. 13; Scheideman Testimony, TR 50-51.) The Red Team concluded that the development phase of the A-12 program was going to cost at least $700 million more than originally planned. (Plaintiffs' Exh. 13; Scheideman Testimony, TR 50-51.)
10. On June 13, 1990, Stanley Pace and John McDonnell met with John A. Betti, Under Secretary of Defense-Acquisitions and Lawrence Garrett, Secretary of the Navy, and other Government representatives to address the performance difficulties General Dynamics and McDonnell Douglas had encountered. At the meeting Mr. Pace and Mr. McDonnell informed Secretary Garrett that the full scale development costs would overrun the contract ceiling price by an amount the contractors could not absorb. (Plaintiffs' Exh. 15; Scheideman Testimony, TR 48.)
11. By letter dated June 20, 1990, Secretary Garrett asked General Dynamics and McDonnell Douglas to provide detailed descriptions of the contractors' three proposed options for proceeding with the A-12 program. (Plaintiffs' Exh. 16.) By letter dated June 27, 1990, John McDonnell and Stanley Pace complied with the Secretary's request and, in addition, outlined their recommendations for restructuring of the A-12 contract. Mr. McDonnell and Mr. Pace also reiterated that the cost of completion was likely to exceed the ceiling price in an amount that was unacceptable to the contractors. (Plaintiffs' Exh. 17.)
12. By letter dated July 12, 1990, the Navy notified General Dynamics and McDonnell Douglas that they had failed to deliver the first aircraft as required by the contract and that the entire A-12 contract was in jeopardy. The Navy requested the contract team to indicate within ten days when it would deliver the first aircraft; its plan to meet the FSED (Full-Scale Engineering Development) schedule; and appropriate consideration for the proposed contract restructuring. (Plaintiffs' Exh. 18; Defendant's Exh. F-74.) The contract team responded to this letter on July 23, 1990. (Plaintiffs' Exh. 20; Defendant's Exh. F-75.)
13. On August 17, 1990, Michael S. Mutty, Contracting Officer  Naval Air Systems Command, issued a modification of the A-12 FSED Contract which unilaterally reestablished the contractual delivery schedule. The Government specifically reserved its right to an equitable adjustment in contract price in consideration for revising the delivery *1309 schedule. The contract modification was issued pursuant to Federal Acquisition Regulation 52.249-8 under the contract's "Default" clause. (Plaintiffs' Exh. 24.)
14. By letter to the Navy dated September 5, 1990, General Dynamics and McDonnell Douglas asserted that there were insufficient funds obligated to the FSED portion of the A-12 Contract to cover the contractors' costs, including termination liability, and requested additional funding. The contractors requested the Government to provide funds at a more rapid rate than that set forth in the contract. The contractors indicated that this request was necessary "to preclude the possibility that the contractors may have to stop work under the contract." (Plaintiffs' Exh. 27.) By letter dated October 3, 1990, the Navy refused the request for additional funds. (Plaintiffs' Exh. 28.)
15. In the latter half of 1990, the A-12 program was reviewed by various military agencies in preparation for final review by the Defense Acquisition Board. (Hereinafter "the DAB.") The DAB was responsible for making a final decision regarding the continuation of the A-12 program. The DAB was scheduled for December 7, 1990. To reach the DAB, the A-12 program had to survive several intermediate reviews. (Defendant's Exh. F-82; TR 151-55.) One of the most important was a phased review of the A-12 design known as the Critical Design Review. (Hereinafter "the CDR.") Problems identified during the CDR were discussed at three Design Review Boards. At the third Design Review Board, the chief Navy procurement officer indicated that the A-12 design problems had been fixed and that the current design would produce an effective aircraft. (Defendant's Exh. F-80, at p. 57; TR 155.)
16. The A-12 program was also discussed in Congress. As late as October, 1990, House and Senate conferees indicated their continued support of the A-12 program in the Conference Report accompanying the National Defense Authorization Act for Fiscal Year 1991. This support was qualified insofar as the conferees recommended that the contractors be required meet certain criteria before the obligation of funds authorized for Fiscal Year 1991. (Defendant's Exh. E-58.)
17. The A-12 program was also discussed at meetings of the General Dynamics Board of Directors. On June 6, 1990, Chairman of the Board Stanley Pace indicated that the contractors were working with the Navy on a possible restructuring of the project. (Plaintiffs' Exh. 32; Defendant's Exh. F-30.) At the August 1, 1990 meeting, Mr. Pace discussed the Navy's termination of its contract with Lockheed for the development and production of the P-7A. The P-7A program had experienced cost overruns and schedule slippage. Mr. Pace suggested that the Navy's response to Lockheed's difficulties with the P-7A might be indicative of its future response to other programs with similar difficulties. (Plaintiffs' Exh. 34; Defendant's Exh. F-32.) On September 12, 1990 and October 16, 1990, Mr. Pace discussed the upcoming DAB and noted that it might lead to termination of the A-12 Contract. (Plaintiffs' Exhs. 35, 36; Defendant's Exhs. F-33, F-34.) At the latter meeting Mr. Pace also noted that there had been additional schedule slippage and increased costs. (Plaintiffs' Exh. 36; Defendant's Exh. F-34.)
18. The media scrutinized the problems affecting the A-12 program. Plaintiffs have introduced into evidence numerous articles wherein the author speculated that the Navy would respond to the A-12 program difficulties by terminating its contract with General Dynamics and McDonnell Douglas. Defendant counters with numerous other articles wherein the author concluded that the need for the A-12 was urgent and the Government would therefore do what was necessary to bring the program to fruition.
19. The contractors were aware that Secretary Cheney had the final say as to whether the contract would be terminated. Therefore, his comments concerning the A-12 are of particular importance. After testifying in April, 1990 as to the urgent need for the A-12 and the smooth course of the development project, Secretary Cheney subsequently discovered that the program was seriously behind schedule and that the projected cost of completion was greatly exceeding previous estimates. Even so, on June 19, 1990, the *1310 Secretary reiterated his belief that the A-12 was a high priority Navy program. (Defendant's Exh. A-76; TR 48-50.) In October, 1990, Secretary Cheney ordered the Navy to develop a new air plan that could be implemented in the event that the A-12 program failed or was significantly reduced or delayed. (Plaintiffs' Exh. 87; TR 38.) However, in a December 7, 1990 interview, the Secretary refused to speculate as to the possible cancellation of the A-12 program. The Secretary noted that many successful weapons systems went through difficult and costly development stages. (Defendant's Exh. A-77; TR 50.)
20. Credible testimony indicates that cost overruns and schedule slippages were not uncommon in the realm of defense contracting, particularly when the government and the contractor had agreed on a fixed-price contract. In most cases the government would find a way to renegotiate the contract terms and therefore cancellation of a major contract was a rare occurrence. This was especially true when the government perceived the subject matter of the contract as a necessary solution to a military need. (TR. 69, 332, 334, 338-39, 342-43, 422).
21. On December 14, 1990, Secretary of Defense Richard Cheney directed the Department of Navy to "show cause" by January 4, 1991 why the A-12 contract should not be terminated. (Plaintiffs' Exh. 44.) By letter dated December 17, 1990, the Navy notified General Dynamics and McDonnell Douglas that the contractors' performance was "unsatisfactory" and that unless specified "conditions are cured by 2 January 1991 the Government may terminate for default...." (Plaintiffs' Exh. 45.; Defendant's Exh. F-88.)
22. On December 20, 1990, General Dynamics issued a special bulletin to all employees at its Fort Worth Division. The bulletin informed employees of the possibility that the A-12 contract might be terminated. In addition, the bulletin notified employees that they would receive a letter the following day concerning the possibility that they might lose their jobs. (Defendant's Exh. D-101.)
23. The following day, on December 21, 1990, General Dynamics issued conditional WARN notices. The December 21 notice was provided to each affected employee individually, to the chief elected official of District Lodge 776, to local government officials, and to the state dislocated worker unit. General Dynamics did not provide separate written notice to the chief elected official of the IAM. However, the president of the IAM learned of the notice either the day it was issued or the day after. (TR. 130.) Like the bulletin issued on December 20, 1990, the WARN notice indicated that the A-12 contract might be cancelled as early as the first week of January. (Defendant's Exhs. C1-C8.)
24. On January 2, 1991, the contractors submitted a letter to Rear Admiral Morris of the Department of the Navy noting that many previously existing problems had been cured and detailing the current status of the A-12 program. (Defendant's Exh. F-89.) In addition, the contractors submitted a proposal for continuation of the project. On January 2-3, 1991, representatives from General Dynamics and McDonnell Douglas met with Assistant Secretary of the Navy Gerald Cohn; Rear Admiral Morris; Eleanor Spector, Director of Defense Procurement, Department of Defense; Secretary Yockey; and several attorneys from the Department of Defense. (Scheideman Testimony, TR 28.) After presentation of the contractors' proposal and two days of negotiation, General Dynamics and McDonnell Douglas offered to absorb a $1.5 billion loss in exchange for a restructuring of the contract. (Defendants' Exh. F-91.) The Government representatives agreed to recommend that the Secretary of Defense accept the contractors' proposal. (Scheideman Testimony, TR. 31-32.)
25. On January 7, 1991, Secretary Cheney directed the Navy to terminate the A-12 contract. By notice to General Dynamics and McDonnell Douglas dated January 7, 1991, the Navy terminated the A-12 contract for default. (Plaintiffs' Exhs. 46, 47). In its termination letter, the Navy cited the contractors' "inability to complete the design, development, fabrication, assembly, and testing of the A-12 aircraft within the contract schedule and the Team's inability to deliver an aircraft that meets contract requirements." (Plaintiffs' Exh. 47.)
*1311 26. The termination of the A-12 contract caused the mass layoff of approximately 1,048 employees at General Dynamics' Fort Worth facility. On January 10, 1991, 859 employees were notified that they would be terminated. WARN notices were sent to each affected employee, the chief elected official of District Lodge 776, local government officials, and a state dislocated worker unit. (Defendant's Exhs. C9-C15.) On January 23, 1991, an additional 189 employees were laid off. WARN notices were provided as above. (Defendant's Exhs. C16-C22.)

Conclusions of Law

A. Jurisdiction.
1. Jurisdiction of this cause is conferred on the Court by 29 U.S.C. § 2104 and 28 U.S.C. § 1331.
2. Venue is proper in this district pursuant to 29 U.S.C. § 2104(a)(5).

B. The Governing Law
1. The WARN statute provides:
An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order 
(1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each employee; and
(2) to the State dislocated worker unit ... and the chief elected official of the unit of local government within which such closing or layoff is to occur.
29 U.S.C. § 2102(a).
2. Employers are excused from the 60-day notice requirement "if the closing or mass lay-off is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). An employer relying on the business circumstances exception "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3).
3. Regulations promulgated under the WARN statute provide in relevant part:
(1) An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer ... might ... be considered a business circumstance that is not reasonably foreseeable.
20 C.F.R. § 639.9(b)(1).
4. The employer bears the burden of proving that the unforeseeable business circumstances exception applies in any given instance. 20 C.F.R. § 639.9.
5. Employers must serve written notice upon "the chief elected officer of the exclusive representative(s) or bargaining agent(s) of affected employees at the time of the notice." However, regulations further state that "[i]f this person is not the same as the officer of the local union(s) representing affected employees, it is recommended that a copy also be given to the local union official(s)." 20 C.F.R. § 639.6(a).
6. In its interpretive comments, the Department of Labor noted:
Commentators suggested that an employee should be required to give notice only to one individual on behalf of a union. While this proposition is generally correct, there may be situations in which a collective bargaining agreement recognizes more than the entity, for example, both a national and local union, as the exclusive representatives. In such cases, notice to the chief elected officer of both entities would be required.
54 Fed.Reg. 16042, 16058 (1989).
7. The WARN Act authorizes the court, in its discretion, to reduce the amount of an employer's liability under the Act if the employer "proved to the satisfaction of the court that the act or omission that violated [the WARN Act] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation." 29 U.S.C. § 2104(a)(4).

C. Conclusions
1. The IAM is an "employee representative" as defined in 29 U.S.C. § 2101(a)(4).
*1312 2. District Lodge 776 is an "employee representative" as defined in 29 U.S.C. § 2101(a)(4).
3. General Dynamics is an "employer" as defined in 29 U.S.C. § 2101(a)(1).
4. General Dynamics' Fort Worth facility constitutes a "single site of employment" within the meaning of 29 U.S.C. § 2101.
5. The employee layoffs ordered by General Dynamics in January, 1991 constituted a mass layoff at its Fort Worth facility within the meaning of 29 U.S.C. § 2101(a)(3).
6. All employees who were or are on layoff exceeding six months have experienced "employment loss" as defined by 29 U.S.C. § 2101(a)(6).
7. The employees represented by the IAM and District Lodge 776 are "affected employees" as defined by 29 U.S.C. § 2101(a)(5).
8. The mass layoff at the Fort Worth facility was caused by General Dynamics' loss of the A-12 Contract. Jones v. Kayser-Roth Hosiery, Inc., 748 F.Supp. 1276, 1286 (E.D.Tenn.1990) (loss of business account caused mass layoff when plant could not operate profitably without the account).
9. Although General Dynamics officials knew as of early June, 1990, that the A-12 development program was irrevocably delayed and over budget, in the unique context of defense contracting a contractor exercising commercially reasonable business judgment would not necessarily conclude on the basis of this information that the A-12 contract would be cancelled. Defense contractors operating pursuant to fixed-price contacts often ran over budget and behind schedule. The government rarely responded by terminating the contract. The Court finds that the events prior to the December 17, 1991 show cause notice from the Department of the Navy are consistent with this general pattern. In addition, the positive outcome of the CDR and the support, albeit qualified, of the congressional conferees gave General Dynamics officials reasonable grounds to believe that the parties to the A-12 contract could reach an accommodation that would permit continuation of the program. See e.g. Jones v. Kayser-Roth Hosiery, Inc., 748 F.Supp. 1276, 1286-88 (E.D.Tenn.1990) (loss of major contract was not reasonably foreseeable when employer had negotiated with customer regarding quality control problems and most recent trend was improvement). Thus, General Dynamics officials were exercising reasonable business judgment in the context of their particular market when they concluded that termination was not a likely outcome.
10. The reasonableness of this conclusion is also supported by the fact that the A-12 was widely perceived as an urgently needed replacement for the A-6E. Secretary Cheney's comments before the House Armed Services Committee and their own knowledge of defense planning, gave General Dynamics officials a reasonable basis for believing that deescalation of the Cold War did not obviate the Navy's need for a replacement for the A-6E. The opinion of Plaintiffs' expert witness, Dr. Lawrence Korb, was that alternatives to the A-12 were available. Moreover, the Navy did explore the other options in the event that the A-12 program failed or was seriously delayed. However, the record in this case demonstrates that support for the A-12 as the preferred successor to the A-6E was sufficiently strong that General Dynamics officials exercised reasonable business judgment when they concluded that termination was unlikely.
11. General Dynamics did not serve a copy of its December 21, 1991 WARN notice on the chief elected official of the IAM. This failure constitutes a technical violation of the WARN Act.[2]See United Electrical *1313 Workers v. Maxim, 5 Ind.Emp.Rts.Cases (BNA) 629, 1990 WL 66578 (D.Mass.1990) (for purposes of determining whether to issue an attachment of defendants' property, plaintiffs had shown reasonable likelihood of success in proving a violation of the WARN Act when employer notified local union but failed to notify the national union). However, General Dynamics proved at trial that the longstanding practice of all parties to the collective bargaining agreement was to assume that the notice to the local union constituted notice to the national union as well. Moreover, the IAM learned of the WARN notice either the day it was issued or the day after. The president of the IAM could not identify any harm that befell the affected employees as a result of General Dynamics' failure to serve a WARN notice on the IAM. For all of these reasons, the Court finds that General Dynamics' failure to serve a WARN notice on the president of the IAM falls within the good faith exception to the WARN Act. 29 U.S.C. § 2104(a)(4). The Court concludes that Plaintiffs are not entitled to any damages on the basis of this technical violation. See United Automobile Aerospace & Agricultural Implement Workers of America, Local 1077 v. Shadyside Stamping Corporation, 947 F.2d 946 (6th Cir.1991).

Conclusion
The Court holds that the cancellation of the A-12 contract on January 7, 1991 was not reasonably foreseeable on November 8, 1990 and, therefore, General Dynamics' failure to issue a WARN notice on November 8, 1990 or at any other time prior to January 10, 1990 does not constitute a violation of the WARN Act. In addition, the Court holds that General Dynamic's failure to send a WARN notice to the president of IAM, though a technical violation of the Act, was a good faith omission in view of the parties' longstanding practice of construing notice to District Lodge 776 as notice to the IAM as well.
ACCORDINGLY,
IT IS HEREBY ORDERED that Plaintiffs' claims for relief are DISMISSED with prejudice.
NOTES
[1] The WARN Act provides that employee representatives may sue to enforce an employer's liability to its employees. 29 U.S.C. § 2104(a)(5).
[2] General Dynamics contends that neither the WARN Act, nor the regulations promulgated under the Act require notice to the chief elected official of both the national and local unions in the case of dual representation. Indeed, the only explicit formulation of this requirement occurs in the interpretative comments to 20 C.F.R. § 639. 6(a). 54 Fed.Reg. 16058 (1989). However, the Court disagrees with Defendants' interpretation of 20 C.F.R. § 639.6(a). Defendants suggest that the regulation merely "recommends" dual notice in the event of dual representation. However, the regulation "recommends" that notice be given to the local official and, by implication, suggests that notice to the national union is mandatory. Finally, and more importantly, the Court notes that the WARN Act itself requires that notice be given to each representative of the affected employees. 29 U.S.C. § 2102(a).