**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LOCAL UNION 7107, UNITED MINE
WORKERS OF AMERICA, DISTRICT 28,
<u>Plaintiff-Appellant,</u>

v.                                                                No. 96-1731

CLINCHFIELD COAL COMPANY,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
Samuel G. Wilson, Chief District Judge.
(CA-94-274-B)

Argued: June 3, 1997

Decided: September 11, 1997

Before HALL and MICHAEL, Circuit Judges, and TILLEY,
United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Hall wrote the opinion, in
which Judge Michael and Judge Tilley joined.

_____

**COUNSEL**

**ARGUED:** Susan Debra Oglebay, Pound, Virginia, for Appellant.
Mark Evan Heath, SMITH, HEENAN & ALTHEN, Charleston, West
Virginia, for Appellee. **ON BRIEF:** Forrest H. Roles, SMITH, HEE-
NAN & ALTHEN, Charleston, West Virginia, for Appellee.

_____

**OPINION**

HALL, Circuit Judge:

United Mine Workers Local 7107 (the union) appeals a summary judgment entered in favor of defendant Clinchfield Coal Company (Clinchfield) in the union's suit challenging the closing of a mine without the 60-day notice period generally required by the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101-2109. We affirm.

I.

Clinchfield, a subsidiary of The Pittston Company, operated the Splashdam mine in Dickenson County, Virginia. All of the coal mined at Splashdam was used in a metallurgical blend called "McClure B." The sole customer for coal mined at Splashdam was Dofasco, Inc., a steelmaker headquartered in Hamilton, Ontario. Dofasco had been a Pittston/Clinchfield customer for thirty years.

Contracts for the sale of McClure B coal to Dofasco were negotiated annually. Clinchfield's side of the bargaining was handled by Pittston Coal Sales Corporation (Pittston Coal Sales), an affiliate that specialized in coal marketing. On January 26, 1994, negotiations broke down when Dofasco proposed a price per ton below that at which Clinchfield felt it could continue to operate Splashdam mine. On January 28, 1994, Clinchfield gave notice to the miners that the mine would close the very next day. We will describe the course of negotiations in more detail below.

The union brought this suit under the WARN Act on behalf of the displaced miners. See 29 U.S.C. § 2104(a)(5). After discovery, Clinchfield moved for summary judgment. It contended that the undisputed facts showed that the closing was due to business circumstances not reasonably foreseeable at the time notice would have been required, i.e. November 29, 1993. The district court agreed, and held further that, as required by the statute, Clinchfield had given as much notice as was practicable.

The union appeals.

2

II.

We review an order granting summary judgment de novo. Disputed issues of fact must be resolved in favor of the non-moving party, and reasonable inferences should be drawn in its favor as well. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-588 (1986). On the other hand, to avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment. See Sylvia Development Corp. v. Calvert County, 48 F.3d 810, 817-818 (4th Cir. 1995).

The WARN Act ordinarily requires sixty days' advance notice of plant closings or mass layoffs. 29 U.S.C. § 2102(a). It contains several exceptions, however, including one for closings "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." § 2102(b)(2)(A). An employer relying on this exception must nevertheless give as much notice as is practicable and briefly explain "the basis for reducing the notification period." § 2102(b)(3). Because the WARN Act is remedial legislation, its exceptions are construed narrowly. Carpenters District Council of New Orleans v. Dillard Department Stores, Inc., 15 F.3d 1275, 1282 (5th Cir. 1994), cert. denied, 513 U.S. 1126 (1995). Moreover, an employer relying on an exception bears the burden of persuasion. 20 C.F.R. § 639.9; International Ass'n of Machinists and Aerospace Workers v. General Dynamics Corp., 821 F.Supp. 1306, 1311 (E.D.Mo. 1993).

The Department of Labor has promulgated regulations interpreting the "not reasonably foreseeable" language. Circumstances are not reasonably foreseeable if they are "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9(b)(1). The employer must exercise "commercially reasonable business judgment" in predicting the demands of its market, though it need not "accurately predict general economic conditions that also may affect demand for its products or services." § 639.9(b)(2). An example of an unforeseeable business circumstance

3

is a "principal client's sudden and unexpected termination of a major contract." § 639.9(b)(1). When confronted with an assertion that the exception applies, a reviewing court must be careful to avoid analysis by hindsight; the trail of harbingers of an unforeseen event always looks brighter in retrospect. See Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996) ("The Act and its regulations necessarily recognize that even the most conscientious employers are not perfect, and they thus allow needed flexibility for predictions about ultimate consequences that, though objectively reasonable, proved wrong."); Chestnut v. Stone Forest Industries, Inc., 817 F.Supp. 932 (N.D.Fla. 1993) (employer's market predictions need not be accurate so long as they are reasonable when made).

In sum, the inquiry in this case is whether, in Clinchfield's "commercially reasonable business judgment," its failure to obtain an acceptable contract with Dofasco was "sudden and expected" enough to entitle it to give but one day of notice to the miners. We now turn to the events leading up to that failure.

III.

Every year during their thirty-year business relationship, Dofasco and Clinchfield would begin negotiations in the fall for the upcoming year's contract. In 1993, Dofasco had purchased 435,000 tons of McClure B coal from Clinchfield, with an option for 58,000 more tons, at a price of $37.05 per ton.

On September 30, 1993, Dofasco told Pittston Coal Sales that it planned to buy about as much coal in 1994 as in 1993. However, Dofasco stated that it had concerns about the McClure B's coke strength after reaction (CSR), a measure of the coal's usefulness for steelmaking.[1] At this point, Pittston Coal Sales' experienced negotiators considered Dofasco's concerns to be mere posturing -- part of the jockeying for position that accompanies any contract negotiation. Nevertheless, they had George Denton, a technical expert and vice-

_____

[1] CSR was the predominant, though not the only, quality problem Dofasco had with McClure B coal. For example, Dofasco also complained about McClure B's excessive variability.

4

president of another Pittston subsidiary,[2] test McClure B's CSR. Denton's tests showed that the 1993 coal was of as high a quality as that of earlier years.

On December 15, 1993, negotiations resumed in Ontario. Dofasco again brought up CSR. Moreover, it informed Clinchfield that it would buy less coal in 1994. The parties had not yet discussed price, but, based on the general coal market, Clinchfield expected the price to be about a dollar per ton less than in 1993. [3]

Dofasco's reiteration of its CSR concerns apparently began to trouble Pittston Coal Sales. On January 14, 1994, its senior vice-president and chief negotiator, Joseph McEnaney, wrote a memorandum to management summarizing Pittston's 1994 metallurgical coal business. Here is what he had to say about Dofasco (emphasis added):

> Our current and future position with Dofasco is in serious jeopardy. We have already been advised that the maximum tonnage we can hope for in 1994 will be on the order of 200,000 [tons] of the McClure B coal, down from last year's level of 435,000 tons. The reason for the reduction is the inability of our coal to produce satisfactory CSR results in their coke blends. This issue has been brought to our attention regularly over the last six months by Dofasco and absent our ability to resolve the problem, they have opted to go with another supplier. The tonnage which Dofasco has left open for us is not secure as yet. Dofasco still awaits our plan to improve that quality, which can only be achieved by reconfiguring the raw coal blend, and receive assurances that Pittston is at least expending its best efforts in this area. In addition to quality improvement, we will also be obliged to take a price reduction as we remain the highest priced coal in their blend.

_____

[2] Pittston Coal Marketing and Development Company.
[3] The notes taken by a Clinchfield negotiator at the December 15 meeting reveal that Dofasco considered Clinchfield's "current price" to be "too high in today's market" and that Clinchfield "[n]eed[ed] to do something on CSR to establish value."

5

Clinchfield contends that, at this point, its negotiators still fully expected to get a contract with Dofasco for 200,000 tons at about $36 per ton, and that it could have continued to operate the Splashdam mine for at least four months at that tonnage and price. It presented affidavits to that effect, including one from McEnaney himself. Nonetheless, on January 26, Dofasco made a take-it-or-leave-it offer to purchase 200,000 tons at $32.50 per ton, about ten percent less per ton than Clinchfield expected. It took Clinchfield two days to recover from its "shock" at this offer, to analyze its economic consequences, and to conclude that it had no choice but to decline it and close the Splashdam mine. It gave a one-day WARN notice on January 28.

We agree with the district court that there is no genuine issue of material fact over whether notice could have been given sixty days before the closing (November 29, 1993). There is no evidence that before December Clinchfield had any real worries about a renewal of the contract on acceptable terms. Vis-a-vis the 60-day period, it is clear that the loss of the Dofasco contract was not reasonably foreseeable.

IV.

Much less clear, however, is whether a reasonable trier of fact could find that the contract loss was no longer "sudden and unexpected" as of some time in December or January. Indeed, the union asserts that McEnaney's January 14 memorandum itself creates a triable issue of fact.

Clinchfield asserts that price -- and price alone-- caused its deal with Dofasco to fall through. This argument points in the right direction but is a tad too pat. Dofasco had emphasized its view that McClure B coal was not of optimal quality for its purposes, and that view inevitably influenced the amount it was willing to pay for the coal. The quality of goods affects demand for them; the day-old doughnuts are half-price for a reason. In fact, on January 24, 1994, Dave Mothersill of Dofasco told McEnaney that McClure B was only "worth" $32.50 a ton.[4] This statement clearly reveals that quality, in

_____

[4] Mothersill did not then _offer_ to buy at that or any price.

6

addition to the general supply of and demand for coal as a commodity, affected the price Dofasco ultimately offered.

On the other hand, Dofasco <u>did</u> ultimately offer to buy a substantial amount of McClure B coal. The union does not contend that Dofasco's offer was insincere or was made with the intention that it be rejected. Indeed, though the price per ton offered "shocked" Clinchfield, it was not self-evident that Clinchfield could not accept Dofasco's terms. Only after two days of economic analysis did Clinchfield conclude that accepting the offer was not in its best interests. In the end, then, there was not a sudden and unexpected <u>termination</u> by Dofasco. Instead, there was an economic decision by Clinchfield to stop selling McClure B coal to Dofasco.

This decision could not have been made at any time before it was made. While a trier of fact could perhaps find that Clinchfield should have expected a price somewhat below its $36 market-based estimate, the parties had simply not addressed price in any specific way before the last week of January 1994. That both sides negotiated for so long without settling on price is mute -- but powerful-- testimony to their expectation that price would not make or break the deal.

In this regard, we cannot ignore the longstanding business relationship between Clinchfield and Dofasco. For thirty years they had met at the bargaining table, and for thirty years they had come up with a deal. This fact alone cannot be dispositive. On the other hand, a lengthy relationship builds a sense of security; the more storms weathered, the fewer feared.**5** The airing and smoothing over of difficulties, real or postured, is central to the negotiator's art, and detecting a deal-breaking grievance among deal-molding gripes is a skill acquired only through experience. Clinchfield's negotiators had that experience, both in general and with Dofasco. They expected an offer to buy coal, and they got one. They could not have reasonably foreseen that Clinchfield would be unable to accept it.

_____

**5 See Jones v. Kayser-Roth Hosiery, Inc.**, 748 F.Supp. 1276 (E.D.Tenn. 1990) (In light of 30-year business relationship with retailer, manufacturer's belief that retailer's complaints could be satisfactorily addressed was commercially reasonable).

7

The judgment of the district court is affirmed.

AFFIRMED

8